51 CCPA

John L. HUDSON, Appellant,

v.

Joseph GIUFFRIDA, Appellee.

Patent Appeal No. 7078.

United States Court of Customs and Patent Appeals.

March 12, 1964.

William A. Zalesak, Princeton, N. J. (Roderick Malcolm, Princeton, N. J., and John Farley, New York City, of counsel), for appellant.

Edward F. Levy, New York City (Morton Amster, Jesse Rothstein, Amster & Levy, New York City, of counsel), for appellee.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH and ALMOND, Judges.

RICH, Judge.

This appeal is from the decision of the Board of Patent Interferences awarding priority of invention to the senior party, Giuffrida. Hudson, the junior party, appeals.[1]

The invention relates to color television picture tubes and is sufficiently described in appellant's brief which quotes with approval from the board's opinion as follows:

"The invention involved relates to a cathode ray tube of the type used in a color television receiver which includes a screen formed of triads of phosphor dots of the three primary colors red, green and blue. Such a tube normally has a separate electron gun for each color and a shadow mask with rows of perforations aligned with the respective triads and spaced a fixed distance from the screen. Then as the three beams are scanned over the shadow mask * * * the beam from each gun will pass through each perforation in such a direction as to impinge on a different color phosphor. Difficulty has been encountered in the prior art because the vertical component of the earth's magnetic field caused a slight bending of the electron beam to the left from the position of a viewer of the screen so that the points of impingement of the beams were centered at points slightly to the left of the respective phosphor dots * * * The phosphor dots were formed on the screen by a photographic process utilizing light beams from a source located to send a beam of light through each hole in the mask from a center located at a point corresponding to the center of deflection of the electron beams. The phosphor dots thus formed are therefore located at the expected points of impingement of the respective electron beams assuming that they travelled in straight lines. Because of the deflecting of the vertical component of the earth's magnetic field this assumption was never true.

"The invention in issue is simply *the shifting of either the light source or the screen with respect to the shadow mask prior to the photographic step in such a direction that the phosphor dots would be formed slightly to the left as viewed from in front of the tube an amount enough to compensate for the curvature in a horizontal direction of the electron beams.*" [Emphasis ours.]

There are two counts, of which count 2 is representative:

"2. A cathode ray tube comprising an evacuated envelope having a horizontal axis, a source of beam electrons mounted adjacent to said axis near one end thereof, a screen unit extending across said axis adjacent to the opposite end thereof in a position to be scanned by beam-electrons from said source, said screen-unit comprising a mask containing a multiplicity of systematically arranged apertures and a screen having a mosaic target surface made up of a multiplicity of groups of elemental areas arranged in a pattern which is systematically

1. The following patent applications are involved: John L. Hudson application serial No. 556,649, filed December 30, 1955, entitled "Color-Kinescopes, Etc.," assigned to Radio Corporation of America: and Joseph Giuffrida application serial No. 600,545, filed July 27, 1956, entitled "Color Television Picture Tube," a division of application serial No. 504,287, filed April 27, 1955, both assigned to Columbia Broadcasting System, Inc.

related to the pattern of apertures in said mask, the pattern of apertures in said mask being centered on said horizontal axis and *the mosaic pattern on the target surface of said screen being off-set from said horizontal axis in a direction and to the extent required substantially to compensate for the deflecting effect of the vertical component of the earth's magnetic field upon said beam-electrons.*" [Emphasis ours.]

The board awarded priority to Giuffrida, based on the filing date of his parent application, April 27, 1955. Hudson alleged conception on January 6, 1955, with diligence from prior to Giuffrida's entry into the field to an actual reduction to practice on May 25, 1955, all of which, if proved, would entitle Hudson to priority. 35 U.S.C. § 102(g). The board held, however, that Hudson's evidence failed to establish diligence in the period January to May, 1955. The sole issue in this appeal is the correctness of that holding.[2]

To understand the issues and the board's decision, a brief discussion of events surrounding the making of the invention will be helpful. In the period from late 1954 to early 1955, both RCA and CBS, assignees of the applications in issue, were seeking ways to correct for misregister[3] in color television picture tubes.[4] There are several kinds of misregister including what appellant characterizes as "mechanical" misregister and "degrouping" misregister.[5] A third kind of misregister, to which the instant invention is directed, is caused by the vertical component of the earth's magnetic field.[6]

In late 1954 to early 1955, RCA was manufacturing metal-cone tubes on a commercial basis and was developing a glass-cone tube. Both types of tubes exhibited serious misregister problems and a substantial part of RCA's work in color tube development was devoted thereto. Similar lines of development were being conducted by CBS. The record shows RCA's laboratories were well-equipped and well-staffed to work on misregister problems. Hudson was working on such problems and conceived the invention in issue as a result of a complaint from the

---

2. In addition to Hudson's alleged dates for conception and actual reduction to practice, Giuffrida alleged conception on February 2, 1955, actual reduction to practice no later than February 14, 1955. The board found it unnecessary to decide whether any of these dates were proved.

    We note at the outset that Giuffrida's earliest date accepted as proved by the board is April 27, 1955, the filing date of his parent application. Thus the critical period of Hudson's diligence is from *prior to* April 27, 1955 to May 25, 1955. The board found lack of diligence from *January* to May, a period inclusive of "*prior to* April 27, 1955 to May 25, 1955."

3. Appellant's brief defines misregister as "the distance that the electron beam is displaced from the center of a given phosphor dot."

4. There are two types of tubes—those with *metal* cones and others with *glass* cones. It was recognized that the earth's magnetic field would more severely affect electron beams traveling in glass-cone tubes than metal-cone tubes since metal cones provide partial shielding against magnetic fields. Hudson's calculations indicated that the correction necessary in glass-cone tubes is twice that of metal-cone tubes.

5. "Mechanical" misregister, a problem in glass-cone tubes, is caused by, inter alia, (1) changes in positioning of the shadow mask frame assembly relative to the phosphor screen and electron source as the tube changes temperature and (2) alignment errors with respect to the shadow mask, electron source and screen in assembling the tube.

    "Degrouping" misregister, according to appellant, predominates in metal-cone tubes and relates to the "tendency for the three electron beams (blue, green, red) to strike the phosphor screen at spots which were too far apart from one another ('degrouped') in the region near the edge of the screen. The electron beams, at the edge of the screen, instead of striking the centers of the phosphor dots, tended to strike points more widely separated than those centers."

6. Hudson's calculations show that such misregister results in beam shift of 5.4 mils (0.0054 inch) for glass-cone tubes, half as much for metal-cone tubes. Also, see fn. 7, infra.

factory production group that there was an "apparent shift of the [electron] beam in the tubes * * * being produced in the factory." He at first thought the shift resulted from simple mechanical misalignment of parts, but later conceived the idea which led to the instant invention.

Both parties allege that in making the invention they first calculated the distance necessary to shift the phosphor dot centers to effect compensation, that they tested the invention by making a picture tube in the laboratory in accordance with such calculation, and that immediately thereafter the invention was incorporated into commercial picture tubes. Appellant says he accomplished all this between January and June and filed his patent application in December, all in 1955. Appellee says he conceived the invention on February 2, reduced to practice on February 14, first employed the invention commercially on March 1, and filed a patent application on April 27, all in 1955.

The board noted the copious record (1200 pages of testimony, 100 documentary exhibits), but said there seemed to be "little dispute as to the actual facts," stating they would confine themselves to points deemed "determinative of the issues involved." Thus only the activity of appellant Hudson, the junior party, was considered.

Briefly, with respect to Hudson's activity the record shows the following chronology: Hudson conceived the invention and made preliminary calculations prior to January 6, 1955; he disclosed the invention to his supervisor, Miss Moodey, on January 6, 1955; despite his desire to test the invention in the laboratory immediately, Dr. Janes, the supervisor of both Hudson and Moodey, recommended delaying testing; in the period January to May, 1955, Hudson continued working on misregister problems; and on May 25, 1955, the invention was tested successfully.

The gist of appellant's position is that the testing delay resulting from Dr. Janes' recommendation was justified under the circumstances since no "mean-ingful" tests were possible until a glass-cone tube of low "mechanical" misregister and in which twice the beam shift error would result could be developed; and that development of such tube was under way to be completed within a few months of January, 1955.

The board said (all emphasis ours):

"Whether or not either or both parties have proven conception as they respectively contend, we are of the opinion that the activity at RCA which is relied on as diligence on behalf of Hudson during the period from January to May of 1955 does not support a holding of diligence for that period. *Throughout this period* there were two different lines of activity at the RCA plant at Lancaster, Pennsylvania. One involved a round metal cone tube of which a number were being produced. Also a glass rectangular tube was under development.

"It appears from the record that because of the shielding effect of the metal cone of the former the displacement according to the invention was determined to be about one half that for a glass tube. It further appears that the metal tubes being produced *could have been used to test the invention* and that Hudson and Miss Moodey, his supervisor, desired to do so. However, it further appears from the testimony of Miss Moodey that when she proposed an immediate test her superior, one Dr. Janes who did not testify, disapproved the proposal and suggested that the tests be delayed until a suitable glass tube became available which was expected to be soon since a larger displacement would be involved than in a metal tube. * * A more specific statement by Miss Moodey concerning Dr. Janes' attitude was as follows:

"'XQ424. Yet Dr. Janes did not approve the making of that test in the early part of 1955 and the building of a tube, is that correct?

" 'A. That is correct, during the first months of 1955, the problems which had been encountered in developing the metal cone tube had been considerable and Dr. Janes told me that he felt the interruption to the tests of the metal tube under way which would be caused by a change in the lighthouse to accommodate a test of Hudson's proposal, would set back some of the tests then under way on that tube. * * *.'

"This evidences a *deliberate delay* in testing the invention in issue because of the decision by Dr. Janes to prefer other tests or production. Dr. Janes did not testify but presumably could have testified had RCA considered that Miss Moodey's statement required explanation or amplification.

\* \* \* \* \* \*

" * * * We are of the opinion that regardless of the state of development of the glass tube, the *deliberate deferment* of testing in a metal tube *in favor of carrying forward other projects* as indicated in the testimony of Miss Moodey quoted above was inconsistent with the exercise of reasonable diligence. * * * [Citations omitted.] The fact that the invention was later considered to be useful in metal tubes indicates that a test in a metal tube *would have been of practical value in the first instance.* And so far as appears from the record Dr. Janes' decision was the only reason not for [sic] making such a test earlier in 1955."

Appellant argues before this court that under the circumstances, deliberate delay in testing the invention was justified, citing Keizer v. Bradley, 270 F.2d 396, 47 CCPA 709; that because metal-cone tubes available in early 1955 had "degrouping" misregister problems "more serious than that from the earth's field," such misregister would "obscure the results of any test of the invention and *render it meaningless*" (emphasis ours); that "mechanical" misregister would "definitely obscure the effects of the invention, and no satisfactory test could reasonably be made [in glass-cone tubes] until after they ["mechanical" misregister] had been eliminated"; that since the invention was twice as effective in glass-cone tubes as metal-cone tubes, it was reasonable to await completion of a glass-cone tube with reduced "mechanical" misregister in which to test the invention; and that fellow RCA employees of Hudson worked continuously from January to May, 1955, to develop glass-cone tubes of requisite low "mechanical" misregister.

To support the above contentions, appellant in his brief relies on testimony of one Van Hekken, an RCA engineer and co-worker of Hudson, from which testimony appellant concludes that no "meaningful tests" of the invention were possible prior to May 1955 since there was available neither glass- nor metal-cone tubes whose respective "mechanical" and "degrouping" misregister was sufficiently small to permit observation of the magnetic field shift.

Appellee argues to the contrary that the invention, being of "striking simplicity," could successfully have been tested in metal-cone tubes available to Hudson prior to May, 1955; that RCA had facilities for so testing; that misregister caused by "degrouping" and by beam shift is "distinguishable at a glance" by skilled technicians since "degrouping" error occurs only at the edges of the tube; that notwithstanding arguments concerning metal-cone tubes, appellant's tests in June, as well as the preferred embodiment of the invention in his patent application, employed a metal-cone tube; that delay in testing the invention in metal tubes is not justified simply because the invention is more useful in glass-cone tubes; and that even glass-cone tubes with large "mechanical" misregister available to appellant before May, 1955, could have been used to test the invention since "uniform error due to the vertical component of the earth's magnetic field is readily discernible from random ['mechanical'] errors."

After careful consideration of the testimony of Hudson and Moodey, we agree with the board that "a test in a metal tube would have been of practical value in the first instance"; that failure to so test was "inconsistent with the exercise of reasonable diligence"; and that such failure to test was a "deliberate delay" motivated primarily by Dr. Janes' desire not to interfere with equipment then in use on other projects.

Hudson's testimony, occupying 252 pages of the record, indicates that the invention grew out of his study resulting from "the problem of determining what caused the *apparent shift* of the beam in the tubes that were being produced *in the factory*, and since there was an apparent shift in a *statistical manner*, * * * [he] was asked to determine just what was causing this." (Emphasis ours.) He further testified that "*data* indicated [an apparent shift] for tricolor kinescopes that were *being manufactured* by * * * RCA * * *." (Emphasis ours.)

With respect to testing the invention, Hudson testified that he "kept talking to Nan [Moodey] about starting the test, initiating the test" but that Moodey "stated it would be logical to use the 22-inch glass rectangular tube which we had contemplated building * * *." When questioned why he did not instruct technicians to build a tube for testing, Hudson testified:

"A. Well, in general I did not have the authority just to walk over and say 'Let's design this tube.' I had to get a test ticket, write out the test ticket, and fill out all the objectives on the test ticket, and I had to get the consent of—well, at that particular time, after this date, I would have to get the consent of Moodey, which she may have had to get the consent of other people in producing a tube."

Nothing in all of Hudson's testimony indicates that he thought a test of the invention at any time after January 6, 1955, was not feasible, nor that such tests would have been "meaningless."

Moodey's testimony similarly indicates that testing the invention anytime after January 6, 1955, was technically feasible. On cross-examination she stated (our emphasis):

"XQ217. At the time of the Hudson proposal relating to shifting the light source,[7] could it not have been

7. By the phrase "shifting the light source," questioner refers to the technique by which color picture tube screens are made. Since such technique succinctly describes what was involved in testing the invention, we quote from appellee's brief:

"A complete understanding of the steps necessary to * * * [test Hudson's invention] may be best obtained by considering the normal commercial practice for the photographic reproduction of the phosphor dot patterns on the face plate of a shadow mask color television tube. Normally, the assembly of the aperture mask and face plate were placed in a fixed position in a conventional 'lighthouse.' The lighthouse included a frame to hold the assembly at a specified distance and in a specified geometric orientation with respect to a high intensity point light source. The light source was arranged to simulate the electron beam emanating from the deflection plane of the color television tube; and the light analog of the electron beam travelled from this point, through the shadow mask and onto the face plate, to expose a photosensitive resist containing an appropriate first phosphor material to produce a pattern of exposed phosphor dots. By photographic techniques, the unexposed material was washed away, leaving a photographically produced dot pattern of the first phosphor. This operation was performed three times with the point light source at three different locations in the deflection plane and using phosphors of the three primary colors to product triads of phosphor dots on the face of the tube; i. e., three phosphor dots arranged in an isosceles triangle for each opening in the shadow mask. When selectively bombarded by electrons from the three electron guns, a color image appears on the face plate of the tube.

"[Hudson's invention could have been tested] * * * simply by taking any given tube at the stage of phosphor dot exposure and laterally shifting the location of the point light source in the three o'clock direction by the appropri-

possible to build a metal cone tube with a correction for misregister in the RCA plant at Lancaster with the lighthouse and other equipment that you had available at that time? A. Yes, I think that was possible, however—

"XQ218. Please don't volunteer—all right, finish your answer. Go ahead. A. We were carrying on an intensive development program at that time on the metal tube and altering a lighthouse to provide an adjustment needed to make a test of Hudson's proposal *took up some of the time when the lighthouse might otherwise have been used to make tubes conventionally.*"

Moodey also testified that RCA had the necessary equipment for effecting tests and that a screen suitable for testing could be made in less than a day. Finally with respect to authority for ordering tests, Moodey testified (our emphasis):

"XQ243. Now, during the early part of 1955, let us say during the months of January and February, could you have asked the development shop to fix up a lighthouse to have the axis of rotation for the three light sources displaced from the axis or from its normal axis by a factor delta s in an appropriate direction to test out the Hudson proposal as you have described it on page 42 of Hudson Exhibit 4? A. I would have asked for this adaptation of a lighthouse but I did not have the authority to have it carried out in view of the magnitude of the efforts required to change the equipment and in view of the *need for using the equipment for other tests.*

"So that it was important not to take the lighthouse out of service for any appreciable length of time.

\*      \*      \*      \*      \*

ate correction factor. \* \* \* With the correction introduced, the triads of phosphor dots would have been offset from the prior art locations a distance sufficient to compensate for the deflec-

"XQ251. Did you make any efforts during January of 1955 to determine just what expenditure or equipment change would be required to test out the Hudson proposal of either offsetting the lighthouse or offsetting the top cap assembly to pre-compensate for the effect of the vertical component of the earth's magnetic field? A. As I have already testified, I discussed with my supervisor, Dr. Janes, the means by which we should test out Hudson's proposal of either the top cap offset or light source offset in the lighthouse and Dr. Janes said that the practical thing to do was to *wait.* until we had a glass bulb, that is,. a rectangular glass bulb and suitable mask frame assembly for this bulb, before we tried out Hudson's proposal *because the glass tube needed the correction more than the metal tube* and would evidence the effects. of the correction to a greater magnitude than the metal tube.

"At the same time Dr. Janes told me in a general way what the difficulties would be in testing Hudson's. proposal in a metal tube. I do not. recollect going into details with him on the exact change that would be needed in the equipment but I did discuss with him *the penalties we would have to pay in loss of metal. tubes constructed on the lighthouse while it was out of service for changeover and adjustment such as a test of Hudson's principle would require.*"

We think the above testimony amply supports the board's holding that "deliberate delay" in testing Hudson's invention is attributable to "the decision by Dr. Janes to prefer other tests or production." The fact that Dr. Janes recognized "difficulties" in testing the invention in tubes available prior to May

tion of the electrons produced by the vertical component of the earth's magnetic field as electrons travelled from the electron guns behind the deflection plane in. the neck of the tube to the face plate."

1955 does not convince us that he delayed tests because, as appellant asserts, they would have been "meaningless."

We have also reviewed Van Hekken's testimony, from which appellant argues pre-May 1955 tests would have been "meaningless" but we find nothing to support appellant's conclusion. As to metal-cone tubes and "degrouping" error, Van Hekken said simply "degrouping was [at] that time [prior to May, 1955] the major problem" and further stated that misregister due to "degrouping" was greater than misregister due to the vertical component of the earth's magnetic field. Van Hekken said nothing about "meaninglessness" of tests. In fact, it appears clear that tests with metal-cone tubes prior to May, 1955, would have been "meaningful" since electron beam shift was recognized in 1954 by factory production personnel who compiled "data" and found the shift to be "statistical." Thus, despite the magnitude of "degrouping" error, the constant shift *was* detected in fact, and was presumably correctable by Hudson's invention.[8]

As above stated, appellant cites our decision in Keizer v. Bradley as precedent supporting the propriety of delaying tests in this case until better tubes were developed. We think the case is distinguishable from the instant case on its facts. There the invention was an automatic chroma control for use with a color television receiver. It appeared that no receiver in which the invention could be tested was available until 10 months after conception of the chroma control invention and that engineers associated with the inventor worked diligently to develop such receiver. This court held that the highly complex nature of the art in its developmental stage justified delaying tests of the automatic chroma control until an adequate receiver could be built. Compare such situation with the instant one. Although, like Keizer, the subject matter herein relates to the highly complex art of color television, appellant's

invention is a "strikingly simple" improvement to an already developed tube. Equipment was available for testing and the record amply shows that tests would have been significant and were delayed primarily to avoid interrupting other projects. We do not consider as germane to the issue of diligence that such tests would have been *more* significant later on.

To sum up: Hudson was not diligent in reducing his invention to practice in the period extending from just prior to April 27, 1955 to May 25, 1955. Priority was properly awarded to Giuffrida on the basis of his filing date, April 27, 1955.

The decision of the board is affirmed.

Affirmed.

---

8. We assume, nothing of record being to the contrary, that the electron beam shift of constant magnitude noted in 1954 was the shift caused at least in part by the vertical component of the earth's magnetic field.